UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                            )
PAUL QI,                                    )
                                            )
            Plaintiff,                      )
                                            )
    v.                                      )    Civil Action No. 10-0190 (RBW)
                                            )
FEDERAL DEPOSIT INSURANCE                   )
CORPORATION, in its capacity as receiver of )
Washington Mutual Bank,                     )
                                            )
            Defendant.                      )
_____)

## MEMORANDUM OPINION

The pro se plaintiff's complaint alleges that the defendant Federal Deposit Insurance Corporation ("FDIC"), as receiver for Washington Mutual Bank ("WaMu"), improperly breached a lease agreement and seeks relief for damages arising from the FDIC-receiver's repudiation of the lease. Currently before the Court is the defendant's Motion for Judgment on the Pleadings Pursuant to Federal Rule of Civil Procedure 12(c) ("Def.'s Mot.").[1] For the reasons explained below, the defendant's motion is granted.

### I. Factual Background

On May 30, 2006, the plaintiff, as lessor, and WaMu, as lessee, entered into lease agreement for the entire occupancy of a commercial building located at 1747 Springfield Avenue, Maplewood, New Jersey. Complaint ("Compl.") ¶ 5. The lease commenced on July 15, 2006, id., had a term of ten years, id., and generally reflected the fact that WaMu intended to use

---

[1] In deciding the defendant's motion, the Court also considered the Complaint, the Verified Answer, Statement of Points and Authorities in Support of Defendant FDIC-Receiver's Motion for Judgment on the Pleadings ("Def.'s Mem."), Plaintiff's Opposition to Defendant's Motion for Judgment on the Pleadings ("Pl.'s Opp'n"), and the Defendant FDIC-Receiver's Reply in Support of its Motion for Judgment.

1

the property to provide commercial banking services, see Verified Answer ("V. Answer"), Ex. A. (Lease § 1.14). As most leases do, the lease set forth the mutual rights and obligations of the parties concerning the use, maintenance, and improvement of the property, as well as the rents due to the lessor from the lessee during the lessee's occupation of the building. See generally id., Ex. A (Lease).

 A. The Lease

The lease specified that the rentable square feet in the building was "[a]pproximately 4,600" square feet, id., Ex. A (Lease §§ 1.11, 1.12), and it identified the tenant's proportionate share of that rentable space as "100%." Id., Ex. A (Lease § 1.13). Section 3.1 of the lease, subtitled "Lease of Premises," explicitly states that "[u]se of any mezzanine, basement or storage space shall be at no additional charge and the area of such space shall not be included in the area of the Premises." Id., Ex. A (Lease § 3.1). The parties agreed to a monthly base rent of $14.78 per rentable square foot for years one through five, increasing to $16.26 per rentable square foot for years six through ten of the lease term. Id., Ex. A (Lease § 1.8). The lease entitled the tenant to written notice of default from the landlord should the landlord determine that the tenant has failed to observe or perform any of the provisions of the lease. Id., Ex. A (Lease § 18.1(b)).

In a section titled "Maintenance, Repairs and Alterations," the lease provides that the landlord "shall maintain, repair and replace as necessary the structural portions of the Building in a first class condition and in compliance with all applicable laws." Id., Ex. A (Lease § 11.1). The lease further specifies that the tenant, "at its sole cost and expense, shall perform all maintenance and repairs to the Premises (other than for those portions of the Premises described in Section 11.1 [(landlord obligations)] above), and shall keep the Premises (other than for those portions of the Premises described in Section 11.1 [(landlord obligations)] above) in good

2

condition and repair, reasonable wear and tear expected." Id., Ex. A (Lease § 11.2). Section 11.2 continues to state that "without limiting the foregoing," the tenant shall be exclusively responsible for maintenance of the buildings HVAC system and maintenance of the parking areas and landscaping. Id., Ex. A (Lease § 11.2). This subsection concludes with the admonishment that "[a]ll repairs shall: (i) be at least equal in quality, value and utility to the original work or installation; and (ii) be in accordance with all laws." Id., Ex. A (Lease § 11.2).

The final subsection of the "Maintenance, Repairs and Alterations" section, entitled "Alterations and Additions," provides that

> Other than as set forth in Exhibit C [to the lease—the Workletter agreement], Tenant shall not make any structural alterations, improvements, additions or utility installations (other than cabling for telephone or computer installations) in or about the Premises . . . without first obtaining the written consent of [the] Landlord. . . . However, [the] Landlord's consent shall not be required for any alteration that satisfies all of the following criteria: (1) complies with all Laws; (2) is not visible from the exterior of the Premises; (3) will not materially affect the systems or structure of the Building; and (4) does not unreasonably interfere with the normal and customary business operations of other tenants in the Building. If [the] Landlord fails to respond in writing within thirty (30) days of [the] Tenant's request for approval of an [a]lteration, [the] Landlord shall be deemed to have approved the alteration.

Id., Ex. A (Lease § 11.4).

The lease also governs tenant improvements of the leased building. See id., Ex. A (Lease § 3.3). The lease provides for a tenant improvement allowance of $15,000 to be paid to the lessee by the lessor for use in "designing, permitting, and constructing" the improvements. Id., Ex. A (Lease § 1.9). Additionally, the lease explains that the Workletter Agreement attached to the lease as exhibit C "sets forth the obligations of [the] Landlord and [the] Tenant with respect to the design and construction of the initial 'Tenant Improvements.'" Id., Ex. A (Lease § 3.3).

> Plans and specifications for such Tenant Improvements . . . shall be subject to the prior approval of [the] Landlord. . . . Upon expiration or sooner termination of this Lease, all improvements and additions to the Premises (other than [the] Tenant's trade fixtures and moveable personal property) to the extent they were paid for using the Tenant Improvement Allowance, shall be deemed the property of [the] Landlord.

3

Id., Ex. A (Lease § 3.3). Section 3 of the Workletter Agreement further clarifies that the lessee shall provide to the landlord

> its plans for [the] tenant's intended leasehold improvements in form suitable for permit application (collectively, the 'Working Drawings'). Working Drawings, and all material changes thereto, shall be subject to [the] landlord's written approval . . ., which shall be deemed given if not denied in writing within five (5) business days after [the] Tenant submits them.

Id., Ex. A (Lease Ex. C [Workletter Agreement ¶ 3]). A concluding section of the Workletter Agreement provides that upon the expiration or termination of the lease, the tenant shall not be required to remove any of the improvements, so long as all of its personal property and trade fixtures are removed and any damage caused by the removal is repaired. Id., Ex. A (Lease Ex. C [Workletter Agreement ¶ 8]).

The last portions of the lease relevant to this case are those that spell out the brokerage commission to be paid by the plaintiff-lessor to WaMu's broker. See id., Ex. A (Lease § 4.4). Section 24.11 of the lease provides for the payment, by the lessor, of the commission earned by the tenant's broker. Id., Ex. A (Lease § 24.11). In a section of the lease affording WaMu a one-time option to terminate the lease on the fifth annual anniversary of the lease's commencement, the lease conditions this right to terminate on the tenant's payment to the landlord of the unamortized portion of brokerage commissions paid. Id., Ex. A (Lease § 4.4).

B. The Bank's Tenancy

Prior to taking possession of the leased building, WaMu's architect submitted, presumably to the plaintiff, "a renovation drawing with a demolition plan." Compl. ¶ 6. This drawing did not show "major structural changes to the building." Id. However, WaMu's contractor "demolished the whole mezzanine," id. ¶ 7, which had previously served as a second floor office and showroom for the prior tenant, id. ¶ 9. This demolition included the removal of

4

steel beams, a utility system, a bathroom, and an escalator. Id. WaMu did not obtain written authorization from the plaintiff before removing the mezzanine. Id.

The plaintiff attached to his complaint an email he sent to a construction project manager he believed was working on WaMu's tenant improvements. Id., Ex. 5. The cover sheet for Exhibit 5 (the email) is entitled "WaMu demolition plan 1,913 Sq[.] Ft[.] mezzanine demolished and my communication with WaMu. Id., Ex. 5. The email, after disclaiming any responsibility for work performed on the parking lot, states "[b]y their architect's mistake, they also cut about 100k worth of steel beams out of the building."[2] Id., Ex. 5. Other than the demolition of the mezzanine, WaMu's tenancy apparently progressed without incident or further communications regarding the mezzanine until the FDIC was appointed as the receiver for WaMu and it repudiated the lease.

### C. The FDIC Receivership and Repudiation of the Lease

On or about September 25, 2008, WaMu became insolvent, was closed, and the FDIC was appointed as the receiver for WaMu. Id. ¶ 10 and Ex. 4 (letter from FDIC-receiver to plaintiff). On March 29, 2009, the FDIC-receiver repudiated the lease agreement between the plaintiff and WaMu. Id., Ex. 4. On June 20, 2009, the plaintiff submitted his administrative claim for damages to the FDIC-receiver. Id. ¶ 13. Pursuant to a letter dated December 8, 2009, the plaintiff's claim was disallowed on the basis that it was not "proven to the satisfaction of the receiver." Id., Ex. 4 (Notice of Disallowance of Claim). The notice disallowing the claim informed the plaintiff of his right to contest the disallowance in this Court. Id.

---

[2] The complaint provides no further clarification of this email or to what it pertains, nor does the plaintiff explain in his opposition the significance of this email, or why he submitted it in with his complaint.

The plaintiff asserts that the building has been empty since April 2009, shortly after the repudiation. Id. ¶ 11. He maintains that the inability to obtain a new tenant for the premises is due to the damaged mezzanine. Id.

D. The Plaintiff's Claims

Based on the facts described above, the plaintiff contends that the FDIC-receiver improperly breached the lease agreement and disallowed his administrative claim. Id. ¶ 16. Accordingly, the plaintiff asks the Court for an order declaring the FDIC-receiver's disallowance void and declaring his claim valid. Id. ¶ 18. Additionally, the plaintiff seeks to recover from the FDIC: (1) the unamortized portion of the brokerage commission he paid to WaMu's broker; (2) the unamortized portion of the tenant improvement credit he paid to WaMu; (3) the estimated cost of restoring the mezzanine; (4) the loss of income resulting from the vacancy, and the amount of property taxes paid during the vacancy; and (5) "proper penalty payment from the receivership for breaching the lease agreement."[3] Id. ¶ 16.

## II. Standards of Review

A. Rule 12(c)

Rule 12(c) of the Federal Rules of Civil Procedure provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). The analysis of a Rule 12(c) motion is essentially the same as that for a motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Plain v. AT&T Corp., 424 F. Supp. 2d 11, 20 n. 11 (D.D.C. 2006). A plaintiff's complaint may therefore be dismissed under Rule 12(c) where "'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" Lindsey v.

---

[3] The plaintiff also requests that the Court appoint an attorney to represent him due to his "current financial situation and limited legal knowledge." Id.

6

Dist. of Columbia, 609 F. Supp. 2d 71, 77 (D.D.C. 2009 (quoting Longwood Village Rest. v. Ashcroft, 157 F. Supp. 2d 61, 66 (D.D.C. 2001)). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, __ U.S. __, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). A court analyzing a motion brought pursuant to Rule 12(c) must "assum[e] the alleged facts [as] true and draw[] all inferences in the plaintiff's favor." Hall v. Lanier, 671 F. Supp. 2d 103, 105 (D.D.C. 2009) (Walton, J.).

Where, as here, the complaint asserts claims arising under a lease (or other contract) that was submitted to the Court by the plaintiff with his complaint, the lease may be considered part of the pleadings for the purposes of Rule 12 analysis. See Uhar & Co. v. Jacob, 710 F. Supp. 2d 45, 49 n.5 (D.D.C. 2010) (noting that although the plaintiff did not attach the lease as an exhibit to the complaint, the court could nonetheless consider the lease because it was referenced in the complaint). Thus, the Court may review the provisions of the lease without converting a Rule 12 motion into a motion for summary judgment, as it has been incorporated into the plaintiff's complaint and is central to the plaintiff's claims. See Meijer v. Biovail Corp., 533 F.3d 857, 867 n.* (D.C. Cir. 2008) (stating that the only materials that can be considered in a motion to dismiss are those "incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned") (citation and internal quotation marks omitted).

B. The Financial Institution Reform, Recovery and Enforcement Act of 1989

The Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA") grants the FDIC as receiver the discretion and power to dispose of assets and liabilities of failed

financial institutions. See 12 U.S.C. § 1821(e)(1); Howell v. FDIC, 986 F.2d 569, 571 (1st Cir. 1993) (explaining that § 1821 governs the powers of the FDIC as receiver). Specifically, the FIRREA grants the FDIC-receiver the authority to "disaffirm or repudiate any contract or lease" to which the failed institution on whose behalf it acts is a party if it determines, in its discretion, that performance of the lease would be burdensome and that such a disaffirmance or repudiation would "promote the orderly administration of the institution's affairs." 12 U.S.C. § 1821(e)(1);[4] see Resolution Trust Corp. v. Ford Motor Credit Corp., 30 F.3d 1384, 1386-87 (11th Cir. 1994). Distinguishing leases from other types of contracts, "Congress has chosen to treat every lease under the provisions of 12 U.S.C. § 1821(e)(4)." FDIC v. Mahoney, 141 F.3d 913, 915 (9th Cir. 1998).

> Section 1821(e)(4) reads in whole:
>
> (4) Leases under which the institution is the lessee
> (A) In general
> If the conservator or receiver disaffirms or repudiates a lease under which the insured depository institution was the lessee, the conservator or receiver shall not be liable for any damages (other than damages determined pursuant to subparagraph (B)) for the disaffirmance or repudiation of such lease.
> (B) Payments of rent
> Notwithstanding subparagraph (A), the lessor under a lease to which such subparagraph applies shall--
> (i) be entitled to the contractual rent accruing before the later of the date--
> (I) the notice of disaffirmance or repudiation is mailed; or
> (II) the disaffirmance or repudiation becomes effective,
> unless the lessor is in default or breach of the terms of the lease;
> (ii) have no claim for damages under any acceleration clause or other penalty provision in the lease; and

---

[4] In its entirety, § 1821(e)(1) provides:
(1) Authority to repudiate contracts
In addition to any other rights a conservator or receiver may have, the conservator or receiver for any insured depository institution may disaffirm or repudiate any contract or lease--
(A) to which such institution is a party;

(B) the performance of which the conservator or receiver, in the conservator's or receiver's discretion, determines to be burdensome; and
(C) the disaffirmance or repudiation of which the conservator or receiver determines, in the conservator's or receiver's discretion, will promote the orderly administration of the institution's affairs.

8

> (iii) have a claim for any unpaid rent, subject to all appropriate offsets and defenses, due as of the date of the appointment which shall be paid in accordance with this subsection and subsection (i) of this section.

Subsection (e)(4)(B) governs the receiver's "overall liability for damages when it repudiates a lease." First Bank Nat'l Ass'n v. FDIC, 79 F.3d 362, 367 (3d Cir. 1996). Section 1821(e)(4)(B) distinguishes "between claims that accrue by the date of the receivership and claims that accrue between the date of receivership and the disaffirmance of the lease." Id. at 368. For example, recovery for "contractual rent," 12 U.S.C. § 1821(e)(4)(B)(i), which should be narrowly construed as "only . . . those sums that are fixed, regular, periodic charges," First Bank, 79 F.3d at 369, expressly delineated in the lease may be recovered up until the later of either the date when the lessor received notice of the disaffirmance of the lease or the dissaffirmance of the lease became effective, 12 U.S.C. § 1821(e)(4)(B)(i). Recovery for "unpaid rent," 12 U.S.C. § 1821(e)(4)(B)(iii), however, may only be reovered up to the "date of the appointment" of the receiver, id., which necessarily occurs before the repudiation of the lease. While the FIRREA does little, if anything, to illuminate the subtle yet important differences between contractual rent and unpaid rent, it is quite clear that the FIRREA does not permit a lessor's recovery for future rents or penalties. See Ford Motor Credit, 30 F.3d at 1387 (noting that the lessor "simply cannot recover future rents"); Howell, 986 F.2d at 573 (stating that the "lessor's damages are limited to past rent and loss of future rent is not compensable"); Unisys Fin. Corp. v. Resolution Trust Corp., 979 F.2d 609, 611 (7th Cir. 1992) (explaining that the "lessor's damages claim is completely exhausted except for back rent"); New Hampshire Assocs. Ltd. P'ship v. FDIC, 978 F.Supp. 650, 653 (D. Maryland 1997) (clarifying that the FIRREA, unlike bankruptcy statutes, "completely extinguishes" the lessor's claims, except for back rent); LB Credit Corp. v. Resolution Trust Corp., 1994 WL 48596, *2, (N.D. Ill. February 16, 1994) (observing that the "FIRREA prohibits the lessor from recovering damages for any future rent payments or lost

opportunity. . . . Damages under FIRREA are limited to unpaid back rent"). Although contractual rent is read narrowly to include only fixed, regular, periodic payments, "unpaid rent" under 12 U.S.C. § 1821(e)(4)(B)(iii) can encompass "claims for obligations other than the [periodic] monetary rent" imposed by a lease. First Bank, 79 F.3d at 368; see id. (explaining that Black's Law Dictionary defines rent as "'consideration paid for use or occupation of property,'" and finding that the lessee's obligation, imposed by the lease at issue in that case to maintain the premises in good repair, was an element of the consideration it paid for use of the property).

### III. Legal Analysis

As an initial matter, there is no question that the FIRREA authorizes the FDIC to repudiate or disaffirm any lease to which a failed "institution is a party." 12 U.S.C. § 1821(e)(1). Moreover, the FIRREA affords the FDIC-receiver great discretion in exercising its repudiation powers. 12 U.S.C. § 1821(e)(1)(B); see Resolution Trust Corp. v. Cedar Minn Bldg. Ltd. P'ship, 956 F.2d 1446, 1455 (8th Cir. 1992) (observing that Congress conferred "broad power" to repudiate contracts and further "directed that . . . receivers should not shy away from wielding this power"). It is thus clear that the defendant possessed the power to disaffirm WaMu's lease with the plaintiff, and acted appropriately when it did so.[5] The plaintiff's claim that the FDIC improperly breached the lease agreement therefore lacks merit.

The fate of the plaintiff's remaining claims hinges upon whether those claims can be classified as back rents—either "contractual" or simply "unpaid"—that were due and owing at

---

[5]  "For a disaffirmance or repudiation to be effective, . . . the decision to do so must be made within a 'reasonable period following [the receiver's] appointment.'" New Hampshire Assocs. Ltd. P'ship, 978 F.Supp. at 654 (quoting § 1821(e)(2)).

the times designated by § 1821(e)(4)(B).[6] As explained below, none of these claims can be deemed back rents under current interpretations of the FIRREA.[7]

First, the plaintiff's claim for return of the unamortized portion of the brokerage commission he paid to WaMu's broker fails to meet the criteria of either contractual or unpaid rent. As noted above, "contractual rent" should be narrowly construed as "only . . . those sums that are fixed, regular, periodic charges," First Bank, 79 F.3d at 369. The contractual rent in the lease at issue is the rent fixed at $14.624 per square foot for years one through five ($68,000/year), and then increasing to $16.086 per square foot for years six through ten ($74,800/year) of the ten-year lease, plus taxes and insurance. Compl. ¶ 5. Thus, the Court must look to the other provisions of the lease to determine if repayment of the brokerage commission was part of the consideration the lessee paid to the lessor for the occupation of the building at 1747 Springfield Avenue in Maplewood, New Jersey. Section 24.11 of the lease shows that the plaintiff agreed "to pay the commission earned by [the] Tenant's Broker in connection with this Lease." V. Answer, Ex. A (Lease § 24.11). Additionally, a June 1, 2006 letter from WaMu's broker to the plaintiff established that once the lease was executed, the broker was entitled to 50% of the commission, with the remaining 50% due when WaMu paid the plaintiff the first month's rent. See Def.'s Mem., Ex. 1 (Brokerage Commission Agreement). Although the letter provided for the broker to recover the commission from WaMu in the event the plaintiff failed to pay, see id., Ex. 1 (Brokerage Commission Agreement), the only mention of the plaintiff's ability

---

[6] Many of the cases cited by the plaintiff in his Opposition interpret § 1821(e)(3) of the FIRREA, a section that speaks to "claims for damages for repudiation." While this is not surprising in light of the fact that the notice of disallowance of claim received by the plaintiff from the FDIC when it denied his administrative claim cites both sections (e)(3) and (e)(4), its clear that § 1821(e)(4) alone applies to the plaintiff's claims and the defenses raised in the defendant's motion. See Mahoney, 141 F.3d at 916 ("Congress has chosen to treat every lease under the provisions of § 1821(e)(4).").

[7] There are no cases from this Circuit interpreting § 1821(e)(4) of the FIRREA.

11

to recover the commission from WaMu appears in § 4.4 of the lease in connection to the tenant's option to terminate the lease on the fifth anniversary after the lease commenced, see V. Answer, Ex. A (Lease § 4.4) (the tenant's "right to [] terminate shall be conditioned upon [the] Tenant's payment to [the] Landlord, on or before the effective date of such termination, of the unamortized portion of . . . [the] brokerage commissions paid by [the] Landlord in connection with this Lease"). At best, repayment of the unamortized portion of the brokerage commission can be construed as consideration for the option to terminate the lease, but it was not a duty assumed by the lessee as consideration for the occupation of the leased premises. Payment of the partial brokerage commission was a contingent recoupment, conditioned upon WaMu's exercise of its option to terminate the lease earlier than the agreed upon ten-year term, and was not unpaid rent due at the time of the receiver's appointment. See Mahoney, 141 F.3d at 916 ("[t]his completely contingent value is not rent due at the time of the receiver's appointment—the only kind of rent the federal receiver is bound to pay"). The plaintiff's claim against the FDIC for the unamortized portion of the brokerage commission is thus not recoverable under the FIRREA.

Second, the plaintiff's claim for the unamortized portion of the tenant improvement credit he paid to WaMu similarly lacks merit as it is neither contractual rent due and owing on the date of repudiation, nor unpaid rent due and owing on the date of the FDIC's appointment as receiver. Because the tenant improvement credit was a onetime payment made by the lessor to the lessee, it is clearly not contractual rent. Again, then, the Court must determine whether any provision of the lease or its attachments indicates that the tenant improvement credit or its repayment by the lessee can be construed as consideration for the lessee's occupation of the leased premises. Section 1.9 of the lease provides for a tenant improvement allowance of $15,000. V. Answer, Ex. A (Lease § 1.9). This payment was due from the plaintiff to WaMu on the commencement

date of the lease.  Id., Ex. A (Lease, Ex. C).  Section 3.3 further provides that "[u]pon expiration or sooner termination of this Lease, all improvements and additions to the premises (other than [the] Tenant's trade fixtures and moveable personal property) to the extent they were paid for using the Tenant Improvement Allowance, shall be deemed the property of [the] Landlord."  Id., Ex. A (Lease § 3.3).  The lease and the Workletter Agreement thus indicate that the plaintiff's recoupment of the tenant improvement allowance, if at all, was to be in the form of the improvements and additions themselves (i.e., non-monetary reimbursement).  The plaintiff's complaint, however, seeks $10,875 as the unamortized portion of the tenant improvement credit, Compl. ¶ 16, which does not constitute unpaid rent due and owing at the inception of the FDIC's receivership.  Accordingly, as the FIRREA "completely extinguishes," New Hampshire Assocs. Ltd. P'ship, 978 F.Supp. at 653, all of the lessor's claims except for back rent, the plaintiff's claim for the unamortized portion of the tenant improvement credit cannot be maintained.

Third, the plaintiff seeks to recover from the FDIC-receiver "the loss of income for the vacancy period" and the amount of property taxes paid during the vacancy.  Compl. ¶ 16.  This claim is easily dispatched on the basis that the FIRREA "prohibits the lessor from recovering damages for any future rent payments or lost opportunity."  LB Credit Corp., 1994 WL 48596 at *2.  Although the lease does make clear that WaMu was responsible for paying all property taxes during its tenancy, which, as consideration for the occupation of the leased premises, can fairly be deemed rent, none of this rent was unpaid as of the date of the appointment of the receiver.  The plaintiff is therefore seeking recovery for future rent and lost opportunity, which are not recognized claims under the FIRREA.

Fourth, the "proper penalty payment," Compl. ¶ 16, sought by plaintiff can be deemed an invalid claim on either of two grounds.  First, that the disaffirmance was not void, and the FDIC

13

therefore merits no punishment or, second, that the FIRREA clearly prohibits recovery based on penalties stemming from the repudiation of leases. 12 U.S.C. § 1821(3)(4)(B)(ii) (providing that the lessor has "no claim for damages under any acceleration clause or other penalty provision" for disaffirmance or repudiation of the lease). The plaintiff's claim for a "poperty penalty payment," Compl. ¶ 16, therefore lacks merit.

Finally, the plaintiff seeks to recover from the FDIC the "[e]stimated cost of restoring the mezzanine." Compl. ¶ 16. Although perhaps a closer call than the plaintiff's other claims, this claim nonetheless fails to meet the FIRREA's delineation of allowable claims for contractual or unpaid rent. The plaintiff argues that § 1821(e)(4) "says nothing about damages which predate disaffirmance; rather, it speaks to future, prospective damages that would normally result from prematurely canceling a lease." Pl.'s Opp'n at 9. As noted above, however, subsection (e)(4)(B) governs the receiver's "overall liability for damages when it repudiates a lease." First Bank, 79 F.3d at 367. Thus, while the plaintiff may attempt to differentiate between general claims that predate repudiation and claims for rent, see Pl.'s Opp'n at 11, 14 (arguing that § 1821(e)(4)(B) does not "mention . . . claims for property damages which accrued during tenant's occupancy" and "such claims are not prohibited anywhere in this section" and stating that "all claims that [] already existed on or prior to the receivership survive"); id. at 16 ("the term unpaid rent has been construed to include all aspects of consideration that a tenant promises a landlord under the lease"), the FIRREA is clear that only claims for past due rents are recoverable. In other words, even if a lessor had valid claim against a lessee for property damage, that claim would only survive repudiation if it could be construed as a claim for unpaid contractual rent or some other form of unpaid rent.

14

The plaintiff places much emphasis on the court's holding in <u>Pioneer Bank and Trust v. Resolution Trust Corp.</u> that § 1821(e)(4) does not prohibit recovery of rehabilitation costs. <u>See</u> 793 F.Supp. 828, 831 ("12 U.S.C. §1821(e)(4) does not prevent recovery of plaintiff's rehabilitation costs"). The plaintiff, however, misses the full extent of that court's ruling. Rather than supporting the plaintiff's argument for the general recovery of the cost of restoring the mezzanine, <u>Pioneer Bank</u> supports this Court's reading of the FIRREA's limitation on claims to rents, simply using different language to describe "rents." For example, in its examination of the legislative history of the FIRREA, the <u>Pioneer Bank</u> court observed that "Congress did not intend to limit the [receiver's] liability under section 4 for accrued lease obligations." <u>Id.</u> Earlier in the opinion, the court noted that "Section 4 makes clear that repudiation does not absolve the receiver of any and all liability. Section 4 guards against penalty and acceleration clauses in leases while still allowing recovery for accrued lease obligations, which most often come in the form of unpaid rent." <u>Id.</u> at 830. In the lease at issue in <u>Pioneer Bank</u>, the tenant was "obligated, among other things, to pay a monthly rent and to make all 'necessary repairs, renewals, and replacements, interior and exterior, structural and nonstructural.'" <u>Id.</u> at 828. The lessee's assumption of the rehabilitation costs, therefore, was part of the <u>rent</u> it owed the lessor, and its failure to pay those costs was recoverable against the receiver as rent due and owing at the time of the receiver's appointment; it was not simply a claim for property damages sustained during the tenancy. Thus, the import of <u>Pioneer Bank</u> is clear: rehabilitation costs can be recovered against a receiver when the lessee-institution assumed responsibility for those costs under the lease as consideration for its occupancy of the leased premises. <u>Accord</u> <u>Commercial Properties Development Corp. v. Resolution Trust Corp.</u>, 1993 WL 541851, *4 (E.D. La. December 20, 1993) (holding that the costs of noticed repairs were entitled to treatment as rent due where the

15

terms of the lease required the lessee to maintain the areas in question). Consequently, for the plaintiff to recover the cost of restoring the mezzanine, WaMu must have in some way assumed the obligation of structural maintenance and repair as part of the rent it owed to the plaintiff.

The several courts that have delved into the issue have found that repair and maintenance costs qualify as "unpaid rent" in circumstances where a tenant has assumed the duty to maintain or repair all of the leased premises, or at least the portion of the leased premises at issue. See Commercial Properties Development Corp., 1993 WL 541851 at *4; Pioneer Bank and Trust, 793 F.Supp. at 831. Here, however, in the comparable section setting forth the parties' duties concerning maintenance, repairs, and alterations of the property, the lease provides that the "landlord shall maintain, repair, and replace as necessary the structural portions of the building," V. Answer, Ex. A (Lease, § 11.1) (emphasis added). Perhaps recognizing this weakness in his argument for recovery of the costs of rebuilding the mezzanine, the plaintiff focuses on "promises" WaMu made in the lease regarding tenant improvements and indemnification for contractor error. See Pl.'s Opp'n at 16 ("WaMu promised not to make any structural changes to the premises without my written consent; further, it promised to be solely responsible for all risks involved in the construction project; and it promised to indemnify me for costs to repair damage to the property caused by its contractors and other agents"). These promises do not evince WaMu accepting the obligation of structural repair as part of the rent it would pay to the plaintiff over the course of the lease.[8] Even assuming arguendo that these provisions did confer rental obligations, the Court finds fault with the plaintiff's argument for several reasons. First, the plaintiff's assertion that WaMu promised to make no changes without his written consent is not

---

[8] Section 11.2 of the lease, on the other hand, in which the tenant accepted responsibility, at its sole cost and expense, to perform all maintenance and repairs to the premises that were not delineated by the previous section as landlord obligations, represents an instance of WaMu accepting the duty of maintenance and repairs as part of the rent owed the plaintiff.

16

quite correct; § 3 of the Workletter Agreement explains that "Working Drawings, and all material changers thereto, shall be subject to [the] Landlord's written approval, which shall not be unreasonably conditioned or withheld <u>and shall be deemed given if not denied in writing</u> within five (5) business days after [the] Tenant submits them."  V. Answer, Ex. A (Lease Ex. C [Workletter Agreement § 3).  The plaintiff does not allege that he denied the working plans in writing.  Thus, because WaMu never received written notice that its construction plans had been denied, the removal of the mezzanine by WaMu's contractor cannot be deemed a "negligent act or omission or willful misconduct of [the] Tenant, or its contractors," <u>id.</u>, Ex. A (Lease, § 20.1), and no obligation arises under the indemnification portion of the lease.  In any event, because the Court finds that the cost of structural repair is not one borne by WaMu under the lease as consideration for occupation of the leased premises, the plaintiff's claim for the estimated cost of restoring the mezzanine is not cognizable under the § 1821(e)(4) of the FIRREA because it is not a request to recover back rent.

## IV.  Conclusion

As explained above, because the plaintiff does not state any claims for back rent, his claims are prohibited by § 1821(e)(4) of the FIRREA.  Accordingly, the defendant's motion for judgment on the pleadings is hereby GRANTED.[9]

```
                              _____/s/_____
                              Reggie B. Walton
                              United States District Judge
```

---

[9]  The Court will issue an Order consistent with this Memorandum Opinion.